J-S25016-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: F.N.H. A/K/A F.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3267 EDA 2016 |

Appeal from the Decree and Order Entered September 15, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000555-2016,
CP-51-DP-0126930-2006

| | | |
|---|---|---|
| IN THE INTEREST OF: K.J.H., JR. A/K/A K.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3269 EDA 2016 |

Appeal from the Decree and Order Entered September 15, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000556-2016,
CP-51-DP-0002178-2013

BEFORE:   BENDER, P.J.E., RANSOM, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY RANSOM, J.:                    **FILED APRIL 12, 2017**

A.H. ("Mother") appeals from the decrees dated and entered on September 15, 2016, terminating her parental rights to her children, F.N.H., a/k/a F.G. (a female born in January of 2006), and K.J.H., Jr. a/k/a K.H. (a male born in March of 2011) (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and the

orders dated and entered on September 15, 2016, changing the Children's

permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A.

§ 6351.[1]  We affirm.

The trial court summarized the factual and procedural history of this

matter as follows:

> On March 10, 2004, Mother's family became known to the
> Department of Human Services (DHS) through a General
> Protective Services (GPS) report alleging that the Mother's family
> had been referred for services due to truancy issues regarding
> the Children's siblings, [P.], [B.] and [J.], and that the Children's
> Mother was noncompliant with services.  The report also alleged
> that [P.], [B.] and [J.] had not attended school for two months.
> The report further alleged that Mother had a history of mental
> health problems.
>
> On March 23, 2005, DHS received a GPS report alleging that
> DHS had been involved with the family in the past due to [P.],
> [B.] and [J.]'s truancy issues; that the family relocated to
> Delaware County for one year; that during that time, [P.] and
> [B.] attended school for only two months.  The report also
> alleged that the family relocated to Philadelphia in April 2005,
> and that the children were not enrolled in school.  The report
> further alleged that Mother suffered from depression, and that
> she took her medication sporadically or not at all.
>
> On February 1, 2006, DHS received an Emergency General
> Protective Services (EGPS) report alleging that Mother had no
> pre-natal care prior to giving birth to F.N.H.; that Mother

---

[1] In separate decrees dated and entered on July 5, 2016, the trial court involuntarily terminated the parental rights of P.L.C., Jr., a/k/a P.G., ("Father"), the father of F.N.H. a/k/a F.G., and K.A.J. a/k/a K.J., the father of K.J.H., Jr., a/k/a K.H., and the unknown fathers of the Children.  Neither father nor any unknown father has filed an appeal from the decrees terminating his parental rights to the Children or the order changing the Children's permanency goal to adoption, nor is any of these individuals a party to the instant appeal.

suffered from depression; and that Mother provided conflicting information regarding where she resided and who had custody of [P.], [B.] and [J.]. The report also alleged that F.N.H. was ready to be discharged from the Hospital of the University of Pennsylvania (HUP).

On February 7, 2006, DHS implemented Services to Children in their Own Homes (SCOH) level II through Family Support Center to assist Mother with obtaining mental health treatment and to monitor the supervision of F.N.H. In or about August 2006, Mother failed to take F.N.H. to a medical appointment to update her immunizations. In or about November 2006, the family's benefits through the Department of Public Assistance (DPA) were terminated, and Mother failed to have the benefits reinstated. In or about December 2006, Mother and the F.N.H. resided in a shelter for approximately one week. At this time F.N.H.'s immunizations were updated. F.N.H. was next scheduled for a medical appointment on January 30, 2007. Between April 4, 2007 and August 14, 2008, DHS placed F.N.H. with the maternal grandfather [W.O.]. On March 25, 2011, Mother gave birth to K.J.H, and on December 10, 2012, DHS implemented In -Home Protective Services (IHPS) through Family Support Services (FSS) into the home of W.O. and eventually a Safety Plan was developed for the Children determining that they would reside with W.O.

On or around July 15, 2013, DHS learned that Mother had taken the Children from W.O.'s home and had them at 5237 Irvine Street, Philadelphia, PA where she had previously rented through the Shelter Plus program and she had been recommended for eviction from this home. DHS contacted Mother and told her to return the Children to W.O.'s home. Mother complied with DHS' request. On or around July 19, 2013, a meeting was held at W.O.'s home with Mother, W.O., DHS, and the agency. Mother was again instructed not to take the children from the home of W.O.. On July 19, 2014, the Consortium developed a letter stating that Mother was receiving treatment for Attention Deficit Hyperactivity Disorder (ADHD) and schizophrenia. On August 29, 2013, DHS learned that IHPS had made several attempts to visit the children in W.O.'s care, but there was no response. It was alleged that W.O. also failed to return the agency's telephone calls. On August 30, 2013, a meeting was held at W.O.'s home with Mother, W.O., DHS, and the agency. DHS learned that Mother had failed to receive any mental health treatment W.O.

stated that he had been home when IHPS had attempted to visit the home, but he did not hear them at the door. DHS learned that Mother often spent nights in the home of the maternal grandmother [A.H.] ("Maternal Grandmother"). DHS further learned that F.N.H. and K.J.H. would sleep on the floor or couch at the home of the Maternal Grandmother.

On September 13, 2013, W.O. stated that he was no longer willing to care for the Children and gave DHS a thirty-day notice. Thereafter, DHS learned that the Children were no longer in W.O.'s care and their whereabouts were unknown. On October 3, 2013, DHS received a GPS report alleging that F.N.H., K.J.H., [P.] and Mother were residing in a home that lacked running water because the water service was disconnected; that the home was filthy and had a foul odor emanating from inside; and that there were bags of trash containing dirty diapers, garbage and roaches in the backyard of the home. The report also alleged that F.N.H. was dirty and unkempt; that she lacked clean clothes. The report further alleged that Mother was unemployed and that there was no information available regarding the Children's fathers.

On or around October 19, 2013, DHS learned that Mother was residing with the Children in the home of Maternal Grandmother located at 359 Paxon Street, Philadelphia, PA. On October 21, 2013, DHS learned that F.N.H. had attended school sporadically over the past few weeks. On October 23, 2013, DHS - learned that F.N.H. was present at school. The police were contacted and asked to transport F.N.H. to DHS. DHS obtained an Order for Protective Services (OPC) for F.N.H. and placed F.N.H. in foster care through Children's Choice, Inc. F.N.H. was very upset about being placed and stated that she did not want to reside anywhere without K.J.H.

DHS learned that F.N.H. had informed school staff at Lamberton Elementary School that she had been sleeping in a car with Mother and K.J.H. for approximately one week. F.N.H. later told DHS that she thought that K.J.H. was with Mother at the home on Irvine Street, Philadelphia, PA. Mother stated that she received mental health services though Belmont Behavioral Health, but DHS was unable to confirm this statement. The identity and whereabouts of F.N.H.'s father was unknown to DHS. The whereabouts of K.J.H.'s father, Mr. Jones was unknown to DHS.

At a shelter care hearing held on October 25, 2013, Mother appeared before the Honorable Jonathan Q. Irvine, who lifted the OPC and ordered the temporary commitment of F.N.H. to stand. The Court ordered that F.N.H. may be moved with appropriate family resource prior to next court listing and that Mother receive twice weekly supervised visits with F.N.H. at the provider agency. On October 29, 2013, DHS filed an Urgent Petition for K.J.H. At the adjudicatory hearing held on October 31, 2013, the Children's maternal cousin, Crystal Savage, appeared before Judge Irvine, who discharged the temporary commitment of F.N.H. to DHS, committed the Children. to DHS, and adjudicated the Children dependent. The Court ordered that Mother receive twice weekly supervised visits at the provider agency; that DHS obtain copies of the Children's birth certificates; and that IHPS be discharged.

On May 18, 2015, CUA held a Single Case Plan (SCP) meeting. The objectives identified for Mother were: (1) to attend supervised visits twice a week for two hours each; 2) to explore family therapy; and (3) to attend the Consortium twice a week for mental health treatment. At the permanency review hearing held on August 18, 2015, Mother appeared before Judge Irvine, who ordered that F.N.H. and K.J.H. remain as committed; that Mother receive unsupervised community visits in addition to once per monthly supervised visit by the provider agency; and that Mother's therapist provide a full report regarding her attendance, progress, treatment and diagnosis.

On August 25, 2015, CUA revised the SCP. The objectives identified for Mother were: (1) to attend unsupervised visits weekly and ensure the children are safe during the visits; and (2) to attend Belmont Behavioral Health to address mental health issues and comply with recommendations. On November 5, 2015, Belmont Behavioral Health issued a letter stating that Mother had been receiving outpatient mental health services since June 19, 2015; that her current diagnosis was Major Depression; that she was prescribed Celexa 20 mg daily to treat depression; and that she had been attending weekly therapy sessions and her medication.

At the permanency review hearing held on January 22, 2016, Mother appeared before Judge Irvine, who ordered that the Children remain as committed; that Mother's visits were to be modified to supervised; that Mother receive two random drug

and alcohol screens prior to next court listing; and that Mother's therapist provide a full report prior to the next listing. CEU's Report as to Mother was incorporated by reference. On February 17, 2016, CUA revised the SCP. The objectives identified for Mother were: (1) to attend supervised visits weekly and ensure the children are safe during the visits; (2) to attend Belmont Behavioral Health to address mental health issues and comply with recommendations and to alert CUA if therapy provider is changed; (3) to appear at CEU for screenings and recommendations; and (4) to alert CUA of any housing prospects and /or programs.

At the permanency review hearing held on February 26, 2016, Mother appeared before Judge Irvine, who ordered that F.N.H. and K.J.H. remain as committed; that Mother be referred to the CEU for an assessment, monitoring, a forthwith drug and alcohol screen and three random drug and alcohol.

On April 18, 2016, CUA visited Mother at her new home located at 5317 Girard Avenue, Philadelphia, PA and Mother informed CUA that she was not attending treatment at Belmont Behavioral Health at that time. She was unable to provide any contact information for any program she was attending Mother visited the Children at Wordsworth's facility. The case manager observed that K.J.H. did not share much time with Mother and that he played independently or with F.N.H.

On May 13, 2016, CUA again revised the SCP. The objectives identified remained the same as the previous SCP. On May 16, 2016, CUA visited F.N.H. at the home of her caregiver. K.N.H. told CUA she disliked visitation on Saturdays because she felt she missed too much of her weekend; that she did not want to be reunified with Mother because she did not trust her due to many disappointments; and that she liked being in the care of the caregiver. The caregiver stated that F.N.H. was doing well in the home.

On June 17, 2016, DHS filed separate Petitions for the Involuntary Termination of Parental Rights in reference to Mother and K.J.H. and F.N.H. On September 15, 2016, the Court held a hearing on the respective Petitions to Terminate the Parental Rights of the Mother, as to the Children. After a full hearing on the merits, the Court found clear and convincing evidence and that Mother failed to achieve her drug and mental

treatment objectives and involuntarily terminated the parental rights of Mother as to Children. Thereafter, Mother filed the instant Appeal on October 13, 2016.

Trial Court Opinion, 11/29/16, at 2-9 (citations omitted).

On June 17, 2016, the Philadelphia Department of Human Services ("DHS" or "the Agency") filed petitions to involuntarily terminate Mother's parental rights to the Children, and petitions to change the permanency goal for the Children to adoption.

On September 15, 2016, the trial court held an evidentiary hearing on the termination and goal change petitions. In decrees and orders dated and entered on September 15, 2016, the trial court found clear and convincing evidence to terminate Mother's parental rights to the Children under section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, and change the Children's permanency goal to adoption under section 6351 of the Juvenile Act. On October 13, 2016, Mother timely filed a notice of appeal with concise statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(a)(2)(i) and (b) with regard to each child. On November 14, 2016, this Court, acting *sua sponte*, consolidated the appeals.

In her brief on appeal, Mother raises the following issues:

1. Did the Trial Court err when it found that the Department of Human Services by clear and convincing evidence had met its burden to terminate Appellant's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), § 2511(a)(2), §2511(a)(5) and § 2511(a)(8)?

2. Did the Trial Court err when it found that the termination of [M]other's parental rights was in the children's best interests and

- 7 -

that the Department of Human Services had met its burden pursuant to 23 Pa.C.S.A. §2511(b)?

3. Did the Trial Court err in changing the permanent placement goal from reunification to adoption?

Mother's Brief, at vi.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial

judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Mother challenges the termination of her parental rights under section 2511(a) and (b). In accordance with our caselaw, we will analyze the sufficiency of the evidence under section 2511(a) and (b) to determine whether the termination is warranted. ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1008-1009 (Pa. Super. 2008) (*en banc*). We have explained that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). ***Id.***

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en*

*banc*).  As such, we will focus on section 2511(a)(2) and (b), which provides

as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party

must produce clear and convincing evidence regarding the following

elements: (1) repeated and continued incapacity, abuse, neglect or refusal;

(2) such incapacity, abuse, neglect or refusal caused the child to be without

essential parental care, control or subsistence necessary for his physical or

mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. ***See In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.*** 797 A.2d 326, 337 (Pa. Super. 2002).

With regard to section 2511(a)(2), Mother contends that the record supports a reasonable inference that she continuously attempted to overcome the barriers to reunification with the Children. Mother asserts that she was found to be in full or substantial compliance with her Single Case Plan ("SCP") objectives from October of 2014 through November 19, 2015. Mother's Brief, at 2, 3. Mother states that, at the permanency review hearing on January 22, 2015, the trial court found compelling reasons not to terminate Mother's parental rights because she was in full compliance with her SCP objectives, and the goal remained reunification once she would locate appropriate housing. Mother's Brief, at ix, 3. Mother acknowledges that the Community Umbrella Agency ("CUA") worker testified at the July 5, 2016 termination/goal change hearing that Mother was not in compliance

with her dual diagnosis mental health/drug and alcohol objectives.[2]  Mother's

Brief, at 3.  Mother also states that the CUA worker, Bayyinah Lewis,

testified at the September 15, 2016 termination/goal change hearing that

Mother had not completed a dual diagnosis program for drug and alcohol

and mental health.  *Id.*  Mother, nevertheless, urges that there is no reason

to believe that Mother is not capable of returning to the status of full

compliance if she re-engages in mental health treatment.  Mother's Brief, at

3.

In its opinion, the trial court stated as follows:

> The Children were adjudicated dependent on October 31, 2013. The record demonstrates Mother's ongoing unwillingness to provide care or control for the Children or to perform any parental duties and her failure to remedy the conditions that brought the Children into care.  The documents and testimony discussed below provided the [trial court] clear and convincing evidence that termination of Mother's parental rights would be in the best interests of the Children.  [The trial court] found clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § §2511(a)(1),(2),(5) and (8)[,] and 23 Pa.C.S.A. § 2511(b).  On May 18, 2015, CUA [("Community Umbrella Agency")] held a Single Case Plan (SCP) meeting.  The objectives identified for Mother were: (1) to attend supervised visits twice a week for two hours each; [(]2) to explore family therapy; and (3) to attend the Consortium twice a week for mental health treatment.  On February 17, 2016, CUA revised the SCP.  The objectives identified for Mother were: (1) to attend supervised visits weekly and ensure the children are safe during the visits; (2) to attend Belmont Behavioral Health to address mental health issues and comply with recommendations[; a]lert CUA if therapy provider is changed; (3) to appear at CEU for

---

[2] The notes of testimony from the hearing held on July 5, 2016, are not part of the certified record in this appeal.

screenings and recommendations; and (4) to alert CUA of any housing prospects and/or programs.

Mother failed to comply with the SCP objectives (1) to obtain housing, (2) to complete drug and alcohol counseling and (3) to comply with mental help recommendations. The CUA Case Manger testified at the September 15, 2016 hearing that Mother failed to comply with the aforementioned SCP objectives. Specifically, the CUA Case Manger testified that[,] although Mother was presently enrolled in a mental help program, Mother had been in several mental health programs but had never completed any program. The CUA Manager also testified that the Mother had never completed a drug and alcohol program. The CUA Manger [sic] testified that Mother was unable to find suitable housing and that she was constantly changing her address. Although Mother regularly visited the Children, visitation remained supervised due to Mother's substance abuse problem. Based upon this testimony elicited at the Termination Hearing as well as the documents in evidence, [the trial court] found clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1)[,] (2)[, and] (5)[,] as Mother had failed to remedy the conditions that brought the Children into care based upon her unwillingness to cooperate with social services as to drug counseling, [and] mental health counselling[,] and the housing demonstrated the Mother's inability or refusal to remedy the conditions that had led to the Children being adjudicated dependent in 2013 within a reasonable period of time.

Trial Court Opinion, 11/29/16, at 10-13 (citations and footnotes omitted).

Termination is warranted pursuant to subsection (a)(2), as Mother clearly lacks parental capacity, and the evidence showed that she will be unable to remedy that situation within a reasonable period of time, if ever. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in finding that Mother's parental rights should be terminated under

section 2511(a)(2). *In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27.

Next, we will address Mother's issues concerning section 2511(b) and the change of the permanency goal to adoption together, as did the trial court. With regard to section 2511(b), Mother asserts that, at trial, the DHS social worker testified that terminating Mother's parental rights would not result in irreparable harm to the Children. Mother contends that, it is arguable that, a review of the record could support a conclusion that, at some point, had she obtained appropriate housing, she would not have lost her parental rights. Mother's Brief, at 5. Mother then argues that, since housing was beyond her control, the trial court should not have terminated her rights under section 2511(b). *Id.*

With regard to the change of the permanency goal to adoption, Mother argues that, pursuant to section 6351(e) of the Juvenile Act, the court shall conduct permanency hearings to determine a permanency plan for the child and the date in which the goal of permanency may be achieved. Mother's Brief, at 5-6 (citing 42 Pa.C.S.A. § 6351(e)(i) and (f)). Mother states that, pursuant to these statutory sections, the court must make a determination as to whether placement continues to be "best suited to the safety, protection and physical, mental, and moral welfare of the child." Mother's Brief, at 6. Mother then contends that the trial court abused its discretion in

finding that changing the Children's permanency goal to adoption served their best interests. *Id.*

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation. *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> . . . concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763-764 (Pa. Super. 2008) (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated

- 16 -

> the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

The trial court found as follows with regard to section 2511(b):

> The [trial court] further found that because there was no strong bond between Mother and [the] Children, terminating parental rights would not cause the Children irreparable harm and would be in the best interests of the Children pursuant to 23 Pa.C.S.A. §2511(b). At the Termination Hearing, the CUA Worker testified that[,] in reference to F.N.H. (1) it was in the best interest of the child that F.N.H.'s goal be changed to adoption and Mother's rights be terminated; (2) F.N.H. would not suffer permanent emotional harm if the [m]other's rights were terminated and (3) that there existed a strong bond between F.N.H. and the foster parent, who was capable of addressing F.N.H.'s medical needs, educational needs and therapeutic needs. At the Termination Hearing, the CUA Worker testified that in reference to K.J.H. (1) it was in the best interest of the child that K.J.H's goal be changed to adoption and Mother's rights be terminated; (2) K.J.H. would not suffer permanent emotional harm if the Mother's rights were terminated and (3) that there existed a strong bond between F.N.H. and her foster parent, who was capable of addressing K.J.H.'s medical needs, educational needs and therapeutic needs.

The testimony of the CUA Worker was deemed to be credible and accorded great weight. As the testimony before the Court on September 15, 2016 indicated, the evidence was clear and convincing that Mother did not remedy the conditions that caused her [c]hildren to come into care and that Mother continued to be unable to provide care for her [c]hildren, warranting the involuntary terminations of the Mother's parental rights pursuant to 23 Pa.C.S. § §2511(a)(1)[,] (2)[,] (5)[,] an [sic] (8). The [trial court] further concluded that the termination of the [m]other's parental rights would be in the best interest of the Children.

CONCLUSION

[The trial court], after careful review of the findings of fact and the testimony presented during the Termination Hearing on September 15, 2016, finds by clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S. [§]2511(a)(1)[,] (2)[,] (5)[,] and (8). [The trial court] further finds pursuant to 23 Pa.C.S. 2511(b), termination of the mother's parental rights would not have a detrimental effect on the Children and would be in the Children's best interest.

Trial Court Opinion, 11/29/16, at 13-14 (citations omitted)/

Our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 620 Pa. at 627, 71 A.3d at 267 (quoting *In re K.K.R.-S.*, 958 A.2d at 535). The Supreme Court instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *In re: T.S.M.*,

620 Pa. at 629, 71 A.3d at 267 (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting)).

We have explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Further, this Court has stated: "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

After a careful review of the record in this matter, we find the record supports the trial court's factual findings, and the court's conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27. There was sufficient, competent evidence in the record for the trial court to find the grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied. There was also sufficient, competent

evidence in the record for the trial court to find that the Children's best interests are served by their respective foster parents, and that no bond exists between the Children and Mother such that the Children would suffer permanent emotional harm from the termination of Mother's parental rights. We, therefore, affirm the decrees terminating Mother's parental rights with regard to the Children under section 2511(a)(2) and (b) of the Adoption Act, and the orders changing their permanency goal to adoption under section 6351 of the Juvenile Act.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/12/2017